UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>v.<br><br>JORGE ARTURO CARDENAS-TOVAR,<br><br>Defendant. | Case No.: 3:19-cr-04370-BTM<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>**[ECF No. 18]** |
|---|---|

Before the Court is the Defendant's motion to dismiss the instant prosecution with prejudice based upon purported violations of the Posse Comitatus Act (the "PCA"). (ECF No. 18.) The indictment charges the Defendant with the felony offense of a removed alien being found in the United States without obtaining permission to reenter in violation of 8 U.S.C. § 1326(a). (ECF No. 10.) The Defendant was arrested on October 2, 2019 by an agent of the United States Border Patrol in an area approximately two miles north of the United States-Mexico border and approximately two miles west of the Tecate Port of Entry in Tecate, California. Specifically, at approximately 8:40 p.m., a United States Marine observed five individuals walking through mountainous terrain in that area. The Marine called out his observations over the radio and a Border Patrol agent responded to the area. The responding Border Patrol agent positioned himself

behind some brush in an area just beyond the five individuals. At approximately 9:00 PM the five individuals approached the responding Border Patrol agent's location, who identified himself in both Spanish and English, and asked each of the subjects their country of citizenship. The Defendant was among those subjects and identified himself as a citizen of Mexico and stated that he did not have any immigration documents permitting him to enter or remain in the United States. The Border Patrol agent then placed the Defendant under arrest. The Defendant was then transported to a Border Patrol station for an interview. No Marines were present during the Defendant's apprehension, arrest, or interview.

Primarily, the Defendant argues that the assistance provided by the Marine, namely the detection and communication of the Defendant's location to the Border Patrol agent, violates the PCA because it amounts to "direct" involvement in civilian law enforcement activities. Alternatively, the Defendant argues that the Marine's aforementioned assistance was "not authorized by the President of the United States" because a memorandum issued by the President on or about November 20, 2018 (the "November 2018 Memorandum") provides that "deployed military personnel shall not, without further direction from the President, conduct traditional civilian law enforcement activities, such as arrest, search, and seizure in connection with the enforcement of the laws.'" (ECF No. 18-1, at 3-4; ECF No. 18-2, at 1.) Further, the Defendant argues that, because the Marine was located approximately three miles northwest of the Tecate Port of Entry when they spotted the Defendant, the Marines were deployed "outside of a designated Port of Entry" and thereby "exceeded the parameters established by the President" in the November 2018 Memorandum. (ECF No. 18-1, at 5.)

"Posse comitatus (literally 'power of the country') was defined at common law as all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder." *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc). "In 1878, Congress codified a prohibition on the

use of the military in civilian law enforcement activities by enacting the PCA," presently codified at 18 U.S.C. § 1385. *Id.* While § 1385 does not directly reference or apply to the Marines, similar restrictions nevertheless apply to the Marines under 10 U.S.C. § 275. *See id.*; *United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994). Section 275 provides that:

> The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

10 U.S.C. § 275. There are numerous statutory exceptions to § 275.[1] *See* 10 U.S.C. §§ 272–74, 279–82. Further, relevant case law has held that the PCA does not prohibit the military from providing "'indirect assistance' to civilian authorities that does not subject civilians to the exercise of military power that is regulatory, proscriptive, or compulsory in nature." *Khan*, 35 F.3d at 431 (internal quotations and citations omitted). To be considered "indirect," the military's "involvement must not constitute the exercise of regulatory, proscriptive, or compulsory military power,

---

[1] None of the statutory exceptions appear applicable to the instant matter. While 10 U.S.C. § 274 authorizes the Secretary of Defense to make military personnel available to operate equipment "with respect to a criminal violation of" 8 U.S.C. § 1326, such authorization only extends to "[d]etection, monitoring, and communication of the movement of surface traffic . . . within the United States . . . if the initial detection occurred outside of the [United States] boundary." *See* 10 U.S.C. § 274(b)(1)(A), (b)(2)(B), & (b)(4)(A)(ii); *but see* 10 U.S.C. 274(c) ("The Secretary of Defense may, in accordance with other applicable law, make Department of Defense personnel available to any Federal, State, or local civilian law enforcement agency to operate equipment for purposes other than described in subsection (b)(2) only to the extent that such support does not involve direct participation by such personnel in a civilian law enforcement operation unless such direct participation is otherwise authorized by law.").

1  must not amount to direct active involvement in the execution of the laws, and must
2  not pervade the activities of civilian authorities." *Id.*

3  The Court finds the instant case analogous to the cases of *Khan* and *United
4  States v. Klimavicius-Viloria*. In *Khan*, the Ninth Circuit held that the PCA was not
5  violated where "a Coast Guard detachment aboard two Navy ships intercepted" a
6  vessel "in international waters" and "[t]he Coast Guard and a contingent of Navy
7  personnel under Coast Guard command boarded and searched the ship,
8  eventually finding . . . hasish," given that "only the Coast Guard had searched the
9  ship and arrested the crew." *Khan*, 35 F.3d at 428, 431-32 ("[W]here the Navy
10 provides backup support in a Coast Guard operation and does not participate in
11 the search of the ship or the arrest and interrogation of the suspects, the military
12 assistance is not direct, not an exercise of military power, and not pervasive of the
13 activities of civilian authorities."). Similarly, in *Klimavicius-Viloria*, the Ninth Circuit
14 held that the PCA was not violated where: (i) a Coast Guard detachment aboard a
15 Navy ship boarded and searched a vessel; (ii) "four Navy engineers helped transfer
16 fluids among the fifteen tanks" of the vessel to ensure its stability; (iii) "[t]he Navy
17 also transported equipment to assist with the search and showed the Coast Guard
18 personnel how to use the equipment[;]" (iv) "[a]fter . . . cocaine was found, Navy
19 personnel helped transfer the [vessel's crewmembers] to the [Navy ship], where
20 Coast Guard personnel arrested, searched and interrogated them[;]" (v) "Navy
21 personnel . . . helped supervise the [crewmembers], gave them medical attention
22 and towed the [vessel] to the United States[;]" and (vi) "Navy personnel did not
23 search the [vessel] nor did they arrest or interrogate the [crewmembers]." *United
24 States v. Klimavicius-Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998).

25 Here, the Defendant was searched, detained, arrested, and interviewed by
26 Border Patrol agents and not by any Marines. Moreover, the Defendant admits
27 that the Marine(s) who observed his position "were assisting" a Border Patrol agent
28 at the time they observed the Defendant and communicated his location to Border

Patrol. (ECF No. 18-1, at 2.) As such, the Marines' involvement in the Defendant's arrest can hardly be described as anything more than backup support and the Court therefore concludes that the Marines' involvement in the Defendant's arrest was too indirect to violate the PCA.

Even assuming *arguendo* that the Marines' involvement rose to the level of direct involvement, however, such involvement appears to have been "otherwise authorized by law" pursuant to Section 1059 of the National Defense Authorization Act for Fiscal Year 2016, PL 114-92, 129 Stat. 726 (November 25, 2015) (the "NDAA 2016"), which provides that "[t]he Secretary of Defense may provide assistance to United States Customs and Border Protection for purposes of increasing ongoing efforts to secure the southern land border of the United States[,]" including "[d]eployment of members and units of the regular and reserve components of the Armed Forces to the southern land border of the United States" as well as "[d]eployment of manned aircraft, unmanned aerial surveillance systems, and ground-based surveillance systems to support continuous surveillance of the southern land border of the United States." *Id.* at § 1059(a), (c)(1 & 2). The Defendant makes no showing that the Marines' involvement in his arrest exceeds the authority granted by the NDAA 2016 or that that such authority has been revoked or circumscribed by the November 2018 Memorandum.[2] (*See* ECF No. 18-2 at 1 ("[T]he Secretary of Defense shall deploy . . . personnel of the

---

[2] The November 2018 Memorandum "memorialize[s] a Presidential directive" that Armed Forces personnel be deployed "to appropriate ports of entry" to protect United States Government personnel based upon purportedly "[c]redible evidence and intelligence indicat[ing] that migrant caravans originating from Central America and moving towards the southern border of the United States . . . may prompt incidents of violence and disorder that could threaten U.S. Customs and Border Protection and other United States Government personnel and prevent them from performing the Federal functions necessary to secure and protect the integrity of the southern border." (ECF No. 18-2, at 1.)

Armed Forces . . . temporarily to appropriate ports of entry to support the Department of Homeland Security by protecting U.S. Customs and Border Protection and other United States Government personnel and by protecting their performance of the Federal functions. To carry out that mission, these deployed military personnel may perform those military protective activities that are reasonably necessary to ensure the protection and safety of Federal personnel, including a show or use of force (including lethal force, where necessary), crowd control, temporary detention, and cursory search.").) Even if the November 2018 Memorandum did limit such authority, however, it only circumscribed the Marines' ability to "conduct traditional civilian law enforcement activities, such as arrest, search, and seizure" (*id.*), and the Court has found that the Marines did not engage in such activities with regard to the Defendant. The Defendant's alternative arguments based upon the November 2018 Memorandum also fail in light of the broader authority granted by Section 1059 of NDAA 2016. Accordingly, the Defendant's motion to dismiss (ECF No. 18) is **DENIED**. Because the Court holds that there was no violation of the PCA, it need not reach the issue of whether dismissal is an appropriate remedy.

**IT IS SO ORDERED.**

Dated: February 25, 2020

Honorable Barry Ted Moskowitz
United States District Judge